# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Matthew F. Kennelly | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 00 CR 407 | **DATE** | 12/8/2000 |
| **CASE TITLE** | USA vs. Michael W. Brown | | |

**MOTION:**

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
    ☐ FRCP4(m) ☐ General Rule 21 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Enter Memorandum Opinion and Order. The for the reasons set for on the attached order, the Court denies defendant's motion to suppress evidence and statements.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | number of notices | | Document Number |
|---|---|---|---|---|---|---|
| ✓ | No notices required, advised in open court. | | | | | |
| | No notices required. | | | | | |
| | Notices mailed by judge's staff. | | | **DEC 1 2 2000** | | |
| | Notified counsel by telephone. | | | date docketed | | |
| | Docketing to mail notices. | | | | | |
| | Mail AO 450 form. | | | docketing deputy initials | | |
| | Copy to judge/magistrate judge. | | | | | |
| OR | courtroom deputy's initials | | FILED FOR DOCKETING 00 DEC 11 PM 1: 15 | date mailed notice | | |
| | | | Date/time received in central Clerk's Office | mailing deputy initials | | |

UNITED STATES OF AMERICA     **DOCKETED**     )

      vs.             DEC 1 2 2000     )     **Case No. 00 CR 407**

MICHAEL W. BROWN                )

## MEMORANDUM OPINION AND ORDER

MATTHEW F. KENNELLY, District Judge:

Defendant Michael Brown has moved to suppress evidence seized and statements he gave following an encounter with United States Customs Service agents on May 23, 2000. The Court held an evidentiary hearing on the motion on September 28, 2000. For the reasons that follow, the Court denies Brown's motion.

### Facts

On May 19, 2000, Customs Inspectors Robert Drummond and Thomas McDonnell were working at O'Hare Airport, near the Air Jamaica ticket counter. They were watching passengers departing on the airline for Jamaica, a known "transit country" for narcotics trafficking, and were looking for possible drug couriers. Drummond, who was outside the terminal, saw Brown and two others arrive at O'Hare by car. The driver handed a ticket to another man, who entered the airport with Brown, gave Brown the ticket, and watched as he checked in at the Air Jamaica counter.

After Brown checked in, he and the other man walked toward the gate area. At McDonnell's direction, Drummond followed them. He saw Brown enter a restroom by himself. There was an announcement by Air Jamaica that Brown's flight was boarding, and according to

Drummond the other man appeared to become nervous. Brown left the restroom, and the two met and then re-entered the restroom together. After exiting the restroom together, the two men walked to the gate where Brown's flight to Jamaica was boarding. The other man watched Brown board, waited for the plane to take off, and left the airport.

Drummond reported these events to McDonnell, and the two of them returned to the Air Jamaica counter and obtained Brown's ticket receipt and other information about him. The ticket receipt indicated that Brown was scheduled to return to Chicago four days later, on May 23, and that his ticket had been purchased for $528 cash three days earlier from a particular travel agency. The inspectors returned to their office, where they obtained Brown's travel history via computer databases. They learned that in the past two years Brown had traveled to Jamaica six times. McDonnell learned that a person who had some connection with Brown's home address had been arrested for smuggling drugs and had given a "proffer" statement in 1996. McDonnell obtained a report of the proffer, in which the other individual stated that Brown was a drug courier for a narcotics trafficking organization. Drummond and McDonnell prepared a report including directions to Customs agents regarding what they should do on Brown's return from Jamaica. The report stated, "hundred percent examination recommended, possible internal."

On May 23, Drummond and McDonnell returned to O'Hare. McDonnell advised the customs inspectors who were on duty about Brown's expected return, told them about his report, and discussed the importance of ensuring that Brown be directed to a "secondary" Customs area and examined. Drummond and McDonnell then met at the terminal and awaited Brown's return. They observed that the man who had accompanied Brown on May 19 was also in the terminal waiting.

2

After Brown left the plane, he retrieved his baggage and was directed to a secondary Customs area for an examination of his baggage. His bag was searched by Customs Inspector Weinbrenner in McDonnell's presence. Nothing incriminating was discovered; specifically there were no narcotics, laxatives, or diuretics in the bag. And nothing about Brown's appearance indicated that he was an internal drug smuggler. Weinbrenner interviewed Brown and reported to McDonnell that Brown had stated that he was an unemployed house painter who had traveled to Jamaica on vacation.

After the interview, Brown was given the option of receiving a pat-down search or being x-rayed by a machine that penetrates only clothing. No other options were given; specifically, Brown was not told that he could leave. He elected a pat-down search, which took place in a private office. It revealed nothing incriminating.

After the pat-down, McDonnell interviewed Brown. Brown said that when he had left for Jamaica, he had traveled to the airport by bus and subway. This was untrue, and McDonnell knew it. Brown also said that he was planning to go home the same way. However, McDonnell had been told by Drummond that the man who had accompanied Brown to the airport was waiting in the airport terminal lobby.

McDonnell then asked Brown if he would consent to an x-ray, and he gave Brown a consent form. Brown agreed and signed the form. There is no indication that McDonnell told Brown where the x-ray would be taken or that Brown would be handcuffed while being transported there. McDonnell then obtained approval from the Assistant Port Director to transport Brown to a nearby hospital for the x-ray. Brown was handcuffed pursuant to a Customs policy that applies in such cases. There is no evidence that he objected to this or that he

3

withdrew his consent to be x-rayed.

At the hospital, Brown was x-rayed after his handcuffs were removed. A physician reported that the x-ray showed foreign bodies in Brown's digestive tract. Brown was then placed under arrest.

## Discussion

Brown argues that the Customs agents lacked a proper basis to conduct the pat-down search, and that his consent to the x-ray was vitiated when he was handcuffed to be taken to the hospital. Brown make no challenge, however, to the validity or voluntariness of his initial consent to the x-ray.[1]

For his argument regarding the pat-down, Brown relies in part on *United States v. Montoya de Hernandez,* 473 U.S. 531 (1985), in which the Court considered the legality of a lengthy detention of a suspected narcotics smuggler pending an x-ray. Based on a number of factors, Customs agents suspected that the defendant, who had arrived on a flight from Colombia, was trying to smuggle narcotics in her alimentary canal. She was taken to a private area for a pat-down and a strip search. During this process, the inspector felt a firmness in the defendant's abdomen which led the inspector to believe that the defendant was in fact carrying drugs in her alimentary canal. The defendant initially consented to an x-ray but then withdrew her consent when she learned that she would have to be handcuffed while en route to the

---

[1] In light of Brown's failure to challenge the validity of his consent, the Court has a great deal of doubt whether a conclusion that the pat-down was unlawful would require the suppression of any evidence; any taint from an unlawful pat-down likely would be purged by Brown's voluntary consent to the x-ray. The government has not argued this point, however, so we will proceed to address the validity of the pat-down.

hospital. She was then given the options of returning to Colombia, agreeing to an x-ray, or remaining in detention until she produced a bowel movement. She chose the first option and was placed in an office under observation. However, arrangements could not be made for an outgoing flight due to the defendant's lack of a visa, and she was therefore informed that she would be detained until she agreed to an x-ray or had a bowel movement. After approximately 16 hours altogether in detention, and no bowel movement, officials obtained a court order for an involuntary x-ray and a rectal examination. The rectal examination revealed balloons later determined to contain cocaine.

The defendant challenged the legality of her detention. The Court noted that "the Fourth Amendment's balance of reasonableness is qualitatively different at the international border than in the interior. Routine searches of the persons and effects of entrants are not subject to any requirement of reasonable suspicion, probable cause, or warrant ...." *Id.* at 538. Though the defendant was "entitled to be free from unreasonable search and seizure ...[,] the expectation or privacy is less at the border than in the interior, [and] the Fourth Amendment balance between the interests of the Government and the privacy right of the individual is also struck much more favorably to the Government at the border." *Id.* at 539-40. The Court rejected the court of appeals' holding that the detention of the defendant was justified only if the inspectors possessed a "clear indication" of alimentary canal smuggling – a standard the lower court had viewed as greater than "reasonable suspicion" but less than probable cause – and held that "the detention of a traveler at the border, beyond the scope of a routine customers search and inspection, is justified at its inception if customers agents, considering all the facts surrounding the traveler and her trip, reasonably suspect that the traveler is smuggling contraband in her alimentary canal."

5

*Id.* at 541.

In this Court's view, *Montoya* does not provide Brown with a great deal of help in this case. The Court there was considering an extended (16 hour) detention without the defendant's express or implied consent. The defendant had withdrawn her consent to an x-ray, so the detention was clearly against her will. Here, by contrast, Brown agreed to an x-ray after the very brief period required to conduct the pat-down, and he never withdrew his consent. Nothing in *Montoya* suggests that the Supreme Court would require the same level of suspicion to justify a pat-down as it would for the extended detention that it considered in that case. Nor, just as importantly, is there anything in *Montoya* indicating that the Court would require agents to "reasonably suspect *that the traveler is smuggling contraband in her alimentary canal*" as a predicate for a mere pat-down (as opposed to, as in *Montoya,* a detention preceding an x-ray of the alimentary canal).

*Montoya* can be read to suggest that a pat-down requires no level of heightened suspicion at all: the Court did, after all, say that "[r]outine searches *of the persons* and effects of entrants are not subject to any requirement of reasonable suspicion, probable cause, or warrant." *Id.* at 538 (emphasis added). Indeed, in the years since *Montoya,* several circuits have held or strongly suggested that no level of suspicion is required in order for a Customs inspector to conduct a pat-down search of a traveler entering the United States, indicating that this is part of a "routine" border search. *See, e.g., United States v. Beras,* 183 F.3d 22, 26 (1st Cir. 1999); *United States v. Carrion,* 872 F.3d 1436, 1442 (10th Cir. 1989); *United States v. Charleus,* 871 F.2d 265, 268 (2d Cir. 1989). *Contra, People of the Territory of Guam v. Sugiyama,* 846 F.2d 570, 572 (9th Cir. 1988) (per curiam) (requiring some increased level of suspicion to justify a pat-down, albeit only

6

"minimal suspicion."); *United States v. Vance,* 62 F.3d 1152, 1156 (9th Cir. 1995) (same). The only Seventh Circuit decision on this point cited by the parties, *United States v. Dorsey,* 641 F.2d 1213 (7th Cir. 1981), preceded *Montoya* by several years and thus may no longer represent good law. In the absence of any more recent Seventh Circuit decision, however, the Court is hesitant to conclude that no heightened suspicion was required in the present circumstances -- and indeed the government disavows any such argument here. *See* Govt. Mem. (filed 11/22/00) at 6. Moreover, a pat-down involves physical contact between a government agent and an individual, and thus arguably is more intrusive than simply looking through the individual's luggage. And in the present circumstances, the pat-down involved taking Brown to a separate and secluded room. This detention (as opposed to, for example, conducting the pat-down at the Customs counter) might well be enough to trigger a requirement of some heightened level of suspicion.

In *Dorsey,* the court rejected the government's argument that a pat-down was part of a routine border search and held that it required "some level of suspicion," 641 F.2d at 1218, but declined to label the required level of suspicion, stating that this "would not be helpful," as "each case requires an inquiry into the level of suspicion and the scope of intrusion presented." In such a case, the court said, we must balance "the level of suspicion of the agent against the level of indignity perpetrated upon the traveler." *Id.* at 1219. Because the parties agree that *Dorsey* applies in this case, we proceed to analyze these factors.

The circumstances of Brown's arrival at O'Hare on May 19 were arguably somewhat suspicious to a reasonable Customs officer. Though there is certainly nothing unusual about one person accompanying another to the airport for a departure on a flight, the combination of the other man's handling of the ticket, his observing from one side while Brown went through the

ticket line, and their joint entry to a restroom was mildly suspicious. The frequency of Brown's

trips to Jamaica and the earlier information, though sketchy, suggesting that he was a drug

courier also provided some basis for the agents to be suspicious that he might be carrying drugs

when he flew back from Jamaica.

On the other side of the balance, the level of intrusiveness visited upon Brown was not

great. Though Brown was taken to a different room, he was merely patted down, and there is no

indication that the agents made any effort to examine under his clothing or that they conducted

the pat-down in a manner that would be considered unduly intrusive.

Based on these considerations, the Court concludes that the agents had the minimal level

of suspicion necessary to justify the pat-down that was conducted in this case, assuming that

some heightened level of suspicion was required. Moreover, these factors plus Brown's

falsehood about how he had gotten to O'Hare airport – which a reasonable agent could believe

was an effort by Brown to conceal his association with the man who brought him to the airport

and gave him his ticket – were enough to justify any further detention of Brown that took place

before he consented, voluntarily, to be x-rayed.[2]

This leaves only Brown's argument that his consent to the x-ray was vitiated when he

was handcuffed and transported to a hospital. The Court rejects this argument. Brown has

offered no authority to support his claim. He argues that "consent is vitiated if it was the

---

[2] Brown points out that the agents seem to have decided, before Brown's return, that he was a likely alimentary canal smuggler and had already planned to do a "hundred percent examination." There is no question that the agents had a motive to obtain Brown's consent for an x-ray. But that by itself does not make the consent involuntary, and as noted earlier, Brown has offered no evidence challenging the validity of his consent.

product of an unlawful seizure," Dfdt. Reply at 8, but in fact Brown's consent preceded the handcuffing and thus cannot be considered a product of that seizure. Moreover, any reasonable person in Brown's position would understand that his agreement to be x-rayed necessarily would entail some additional delay and that his movement would be restricted during that delay. There is nothing to indicate that the inspectors advised Brown that he could leave and come back for an x-ray at his leisure, and no reasonable person would think that that was what was being proposed. In short, Brown's consent included an implicit agreement to be held by the agents for the period necessary to conduct the x-ray. Under those circumstances, his argument that the encounter became a full-fledged arrest is simply beside the point; Brown consented to remain in the agents' custody.

Though one might imagine that telling Brown that he would be handcuffed on the way to the hospital might have affected his decision to agree to the x-ray in the first place, Brown has offered no evidence supporting such a claim. And the evidence does not reflect that he objected in any way when the handcuffs were applied. Absent such evidence, a claim that the handcuffing would have affected Brown's decision to consent is entirely speculative.

### Conclusion

For the reasons stated above, the Court denies defendant's motion to suppress evidence and statements.

Date:   December 8, 2000

MATTHEW F. KENNELLY
United States District Judge